IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JASON BENNETT, on behalf of himself | * | Civil Action No. 14-00330 |
| and all others similarly situated | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| | * | |
| BOYD BILOXI, LLC, d/b/a IP Casino | * | |
| Resort and Spa; | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS

COMES NOW Plaintiff in the above-styled cause, by and through undersigned counsel, and files this Memorandum of Law in Opposition to Defendant's Motion to Dismiss, and for each of the reasons stated herein, respectfully requests this Court to enter an Order denying the said Motion in its entirety, and order that the causes of action proceed to discovery, and a full and complete trial on the merits.

### STATEMENT OF THE CASE AND SUMMARY OF ARGUMENT

The Telephone Consumer Protection Act (TCPA) prohibits the initiation of a call using an artificial or pre-recorded message for telemarketing purposes absent the called parties' prior express written consent to a cellular telephone or a residential landline.  As discussed more fully herein, the standard is exactly the same – Defendant may not deliver a pre-recorded telemarketing message to a cellular or residential telephone line without the called parties' prior express written consent to receive such pre-recorded telemarketing messages.

1

This case arises from the intentional and repeated efforts of Defendant to market its casinos and resort hotels, in plain violation of the Telephone Consumer Protection Act, 47 U.S.C. §227 *et seq*. (hereinafter referred to as the "TCPA"). Defendant has, on eight (8) separate occasions, initiated calls to Plaintiff's telephone using a pre-recorded voice to deliver telemarketing messages to Plaintiff; despite the fact that Plaintiff has never provided his prior express written consent to receive such telemarketing calls. Each message offered Plaintiff two (2) free tickets to concerts at Defendant's casino as a part of Defendant's overall marketing campaign; and, as such, constituting telemarketing.

Plaintiff, on behalf of himself and the putative class members, filed the instant case seeking injunctive relief, a judgment against Defendant for violations of the TCPA and statutory damages as set forth in the statute, the costs incurred in this action, and for such other, further and different relief to which Plaintiff and Class Members may be entitled under the circumstances.

Boyd Gaming Corporation, Defendant's Parent Company, filed a Motion to Dismiss wherein it asserted that Boyd Biloxi, LLC d/b/a IP Casino Resort and Spa was the proper Defendant in this action, not Boyd Gaming Corporation.[1] Plaintiff then amended his Complaint to reflect Boyd Biloxi, LLC d/b/a IP Casino Resort and Spa as the proper Defendant in this action. Defendant then filed a second Motion to Dismiss; which was rendered moot by Plaintiff's Second Amended Complaint.

Defendant has now filed the current Motion to Dismiss, wherein it first argues that the subject calls do not constitute telemarketing. It characterizes the messages as purely informational in nature. Defendant argues that the Court should ignore the allegations of the

---

[1] Defendant's first Motion to Dismiss was filed without any indication from Defense Counsel that Defendant was improperly named – an error that could have been corrected with a telephone call and did not require a fully briefed, dilatory Motion to Dismiss.

Second Amended Complaint, the Rule 12 Standard of Review, the FCC's definition of "telemarketing" and/or an "advertisement," and all common sense regarding casino promotional campaigns; and, instead look only for key words or phrases contained in the exact text of the pre-recorded message in order to carve out an exception to the TCPA that will allow telemarketers to side-step the provisions of the statute by simply crafting their pre-recorded messages in such a way to avoid certain liability words like "offer" or "sale." Despite Defendant's characterization of the prerecorded messages, the fact remains (as alleged) that each of the subject pre-recorded messages were sent as part of the Defendant's overall marketing efforts designed to encourage the future sale of goods or services; which constitutes "telemarketing" and/or and "advertisement," and required Plaintiff's prior express *written* consent. 18 F.C.C.R. 14014, 14098 (2003)("FCC 2003 Order"), ¶¶ 139 – 142; 47 C.F.R. §64.1200.

Defendant further argues (based upon its characterization of the subject messages as purely informational in nature) that the case should be dismissed because the calls fall within the noncommercial/non-telemarketing call exception to the TCPA, which does not require prior express *written* consent. Defendant correctly states the rule (that noncommercial/non-telemarketing calls require only express consent), but its argument that this rule applies is premised on the faulty assumption that the calls do not constitute telemarketing; which they do. Therefore, prior express written consent is required pursuant to 47 C.F.R. §64.1200.

Defendant next argues that, for various reasons, Plaintiff's class action allegations should be stricken. As set forth fully below, each of Defendant's arguments should be rejected.

## PERTINENT FACTUAL ALLEGATIONS

Plaintiff has a telephone number that he has used for many years.  Plaintiff has never provided his prior express written consent, as defined by 47 C.F.R. §64.1200, to be contacted by Defendant for telemarketing purposes.  However, despite the absence of his consent, Plaintiff received multiple pre-recorded messages offering "2 free tickets" to various concerts, and encouraging Plaintiff to "visit BConnected online to view all of [his] offers."

The calls placed to Plaintiff were each a "telemarketing call" and/or an "advertisement," as those terms are defined in 47 C.F.R. 1200.64(1) & (12) U.S.C. § 227(a)(4). The term "telemarketing" applies to any call or message initiated for the purpose of encouraging the purchase of goods or services.  "Advertisement" includes any message promoting the availability or quality of goods or services.  47 CFR §64.1200 (f) (1) & (12).  A message need not include a sale or offer in the message itself to constitute "telemarketing" or "advertising." Any message which is sent as part of the caller's overall marketing efforts designed to encourage the future sale of goods or services constitutes "telemarketing" and/or "advertisement."   18 F.C.C.R. 14014,14098  (2003)("FCC 2003 Order"), ¶ ¶ 139 - 142.

The pre-recorded messages delivered to Plaintiff each constitute "telemarketing" and/or "advertisement."  Each pre-recorded message encouraged Plaintiff to "visit BConnected online to view all of [his] offers;" where Defendant offered discounts on room reservations, coupons/discounts for food purchases, "free play" on Defendant's casino floor, etcetera.  Further, each pre-recorded messages related to and/or promoted activities at Defendant's Resort, and was part of the Defendant's overall promotional and marketing program designed to encourage future purchases of goods and services offered at the IP Casino, Resort and Spa such as hotel stays, spa services, retail shopping and plays at the gaming facility.  Further, Plaintiff was selected as the

intended offeree of concert tickets and other offers because, through the BConnected program, Defendant tracked Plaintiff's betting activity and deemed Plaintiff a valuable enough customer to receive promotional offers intended to encourage him to visit Defendant's casino; where Defendant anticipated Plaintiff would purchase the goods and services offered at the IP Casino Resort and Spa (book a hotel room, eat in its restaurants, and – most importantly – place bets on Defendant's gaming floor).  As such, although the calls contained an informational element, the purpose of the calls was to encourage visits to the resort (and the resulting sale of goods and services offered by Defendant), and were motivated by Defendant's desire to sell additional goods and services to Plaintiff.

## STANDARD OF REVIEW - RULE 12(b)(6)

"When deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, the district court must construe the complaint in the light most favorable to the plaintiff and must accept all the factual allegations contained in the complaint as true." *See Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010) (citing to *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). "In order to survive a Rule 12(b)(6) motion to dismiss, [Plaintiff's] complaint need only "enough facts to state a claim to relief that is plausible on its face." *Paige v. Coyner*, at 277. (referencing *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007)). To survive a motion to dismiss, a complaint must "give the defendant fair notice of what the . . . claim is and the ground upon which it rests." *Twombly,* at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In *Twombly*, the Supreme Court articulated the following standard regarding factual allegations that are required to survive dismissal:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his

"entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Twombly* at 555. A complaint must contain sufficient factual matter to "state a claim that is plausible on its face." *Id*. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, at 570). Further, the plausibility standard calls for a "context specific" inquiry that requires the court "to draw on its judicial experience and common sense." *Id*. at 1950.

## ARGUMENT AND AUTHORITY

### A. PLAINTIFF'S SECOND AMENDED COMPLAINT PROPERLY STATES A CLAIM UNDER THE TCPA

#### (1) Defendant's Prerecorded Messages Constitute Telemarketing

The TCPA prohibits Defendant from initiating a telephone call to Plaintiff using a prerecorded message that constitutes telemarketing or advertising, unless Plaintiff has provided his prior express written consent to receive such a call.  47 C.F.R. §64.1200.

Defendant argues that the subject prerecorded messages do not constitute telemarketing. Specifically, despite the allegations set forth in paragraph 18 of Plaintiff Second Amended Complaint, the FCC's definition of telemarketing, and the most basic common sense understanding of promotional marketing, Defendant argues that the content of the subject messages should be viewed as narrowly as possible in order to determine that the messages Defendant delivered to Plaintiff did not contain key words or phrases necessary to "sell something."  Memorandum in Support of Defendant's Motion to Dismiss, at 6.  Instead, Defendant alleges that its prerecorded messages were purely informational in nature; as innocent

6

as a message from the local school board informing parents of a school closing.

Defendant's argument is a disingenuous attempt to side-step the TCPA's protections by taking the narrowest possible view of the messages themselves as well as the definition of "telemarketing."   To accept Defendant's narrow reading of the content of the messages, absent any consideration of its promotional activity or overall marketing campaign, would allow telemarketers to side-step the TCPA by simply crafting their messages to avoid an explicit mention of a good, product, or service.  Therefore, the FCC has held that the "application of the prerecorded message rule should turn, not on the caller's characterization of the call, but on the purpose of the message." *Id* at ¶ 141.  This is consistent with the fact that the TCPA is a consumer protection statute, remedial in nature, and should be construed liberally in favor of consumers. *See, e.g.*, *Legg v. Voice Media Grp., Inc.*, 990 F. Supp. 2d 1351, 1354 (S.D. Fla. 2014).

The term "telemarketing" applies to any call or message initiated for the purpose of encouraging the purchase of goods or services.   "Advertisement" includes any message promoting the availability or quality of goods or services.  47 CFR §64.1200 (f) (1) & (12). "Telemarketing" does not, however, require a sale to be made during the call in order for the message to be considered an advertisement. *See In re of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014,14098, ¶ 140 (2003)("FCC 2003 Order"), ¶ ¶ 139 - 142.[2]

> The TCPA's definition does not require a sale to be made during the call in order for the message to be considered an advertisement. Offers for free goods or services that are part of an overall marketing campaign to sell property, goods, or services constitute "advertising the commercial availability or quality of any property, goods, or services."  Therefore, the Commission finds that prerecorded

---

[2]FCC Orders interpreting the TCPA are final and binding.  *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1118, 19 (11th Cir. 2014); *Leyse v. Clear Channel Broad., Inc.*, 545 F. App'x 444, 459 (6th Cir. 2013).

messages containing free offers and information about goods and services that are commercially available are prohibited to residential telephone subscribers, if not otherwise exempted.

Id., ¶ 140.

A message need not include a sale or offer in the message itself to constitute "telemarketing" or "advertising." Any message which is sent as part of the caller's overall marketing efforts designed to encourage the future sale of goods or services constitutes "telemarketing" and/or "advertisement." 18 F.C.C.R. 14014,14098 (2003)("FCC 2003 Order"), ¶ ¶ 139 – 142. It is not, however, required that a prerecorded message be selling something during the call in order for the message to be considered an advertisement. *See In re of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014, 14098, ¶ 140 (2003). Offers for free goods or services that are part of an overall marketing campaign to sell services constitute "advertising the commercial availability or quality of any property, goods, or services." *Id*. The FCC specifically stated that "prerecorded messages containing free offers and information about goods and services that are commercially available are prohibited. *Id*. Further, the "application of the prerecorded message rule should turn, not on the caller's characterization of the call, but on the purpose of the message." *Id* at ¶ 141.

Defendant characterizes the subject messages are purely informational, and placed solely for the purpose of informing Plaintiff that it was giving him something for free (with no strings attached, and without intention or hope that Plaintiff would visit one of Defendant's restaurants, book a hotel room, or place bets on its gaming floor). However, when a modicum of common-sense is applied, it is clear that the purpose of the messages delivered to Plaintiff was, as part of Defendant's overall marketing campaign, to promote the IP Biloxi Casino and Spa. Each pre-recorded message encouraged Plaintiff to "visit BConnected online to view all of [his] offers;"

where Defendant offered discounts on room reservations, coupons/discounts for food purchases, "free play" on Defendant's casino floor, etcetera.  Further, Plaintiff was selected as the intended offeree of concert tickets and other offers because, through the BConnected program, Defendant tracked Plaintiff's betting activity and deemed Plaintiff a valuable enough customer to receive free promotional offers intended to encourage him to visit Defendant's casino; where Defendant anticipated Plaintiff  would purchase the goods and services offered at the IP Casino Resort and Spa (book a hotel room, eat in its restaurants, and – most importantly – place bets on Defendant's gaming floor).  Further, the Amended Complaint alleges that the calls were made to promote "the IP Biloxi Casino and the 'BConnected Players' Club Program,' a program operated by Defendant which connects consumers to the IP Biloxi Casinos and other related casino properties 'Las Vegas to Louisiana to Illinois and Indiana to Mississippi.'" Amended Complaint, ¶ 18.   That description falls squarely within the FCC's definition of "advertising" and "telemarketing" which turns on the purpose of the call rather than the language the caller uses. FCC 2003 Order, ¶ 141.

In its 2012 Order, the FCC repeatedly refers to what it considers non-telemarketing calls as "purely informational."  *See In Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, (2012)("FCC 2012 Order"), ¶¶ 2, 3, 17, 21, 28 -29. For example, the FCC states that "prior express consent is not required for purely informational calls, *i.e.* non-telemarketing."  Id., Appendix C, ¶ 8.  Examples given of "purely informational" calls include calls with information regarding school or workplace closings.  Id., ¶ 17. Thus, the FCC views non-telemarketing as calls which are "purely" informational.  In its 2003 Order, the FCC specifically addresses a "dual purpose" calls which, while informational, also serves the commercial purpose of encouraging the sale of goods or services. These "dual purpose" calls

constitute telemarketing.  FCC 2003 Order, ¶ 142.

Defendant's messages cannot be characterized as "purely" informational.  Defendant's messages, at best, served a dual purpose in that, while informing Plaintiff of the promotional events available to him free of charge, the calls (as well as the specific events referenced in the messages) were made to encourage the called party to visit the resort and purchase additional services from Defendant. In fact, the informational component of the subject messages are merely a "smokescreen to mask the true purpose" of encouraging Plaintiff to engage in the commercial activity of purchasing services from Defendant. *See, for example, Phillips Randolph Enterprises LLC v. Adler-Weiner Research, Inc*., 526 F.Supp.2d 851 (N.D. Ill., 2007); *see also Ameriguard, Inc. v. University of Kansas Medical Research Institute, Inc*., 2006 WL 1766812 (W.D. Mo., 2006).  (In both cases, the subject material did not constitute "marketing" because the facsimiles merely sought participants in a clinical research; and there was no indication that the true reason for sending the facsimiles was to promote the activities of the research clinics to those that received the facsimiles).

However, *Chesbro v. Best Buy Stores*, 2012 WL 6700555 (9th Cir. 2012) offers some clarity on what constitutes "telemarketing" in the context of messages that appear, on their face, to be informational in nature, but in fact constitute telemarketing.  In *Chesbro*, the defendant, like the Defendant in the instant case, sent messages that it claimed to be purely "informational." In ruling that the messages constituted telemarketing, the Court noted that neither the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context, the Court approached the problem "with a measure of common sense." *Id*.  The Court reasoned that:

> The robot-calls urged the listener to "redeem" his Reward Zone points, directed him to a website where he could further engage with the RZP, and thanked him

for "shopping at Best Buy." Redeeming Reward Zone points required going to a Best Buy store and making further purchases of Best Buy's goods. There was no other use for the Reward Zone points. Thus, the calls encouraged the listener to make future purchases at Best Buy.

Applying "measure of common sense" to the instant case, the messages delivered by Defendant to Plaintiff constitute telemarketing.  The call informed Plaintiff that he was entitled to free tickets to various concerts.  However, despite Defendant's characterization of the call, the purpose of the messages was, as part of Defendant's overall marketing campaign, to promote the IP Biloxi Casino and Spa.  Plaintiff was selected as the intended offeree of concert tickets and other offers because, through the BConnected program, Defendant tracked Plaintiff's betting activity and deemed Plaintiff a valuable enough customer to receive free promotional offers intended to encourage him to visit Defendant's casino; where Defendant anticipated Plaintiff would purchase the goods and services offered at the IP Casino Resort and Spa (book a hotel room, eat in its restaurants, and – most importantly – place bets on Defendant's gaming floor).  As such, Defendant's offer of free tickets is designed to encourage Plaintiff to visit the casino property, and is barely one step removed from an actual offer.  *Margulis v. P&M Consulting, Inc.*, 121 S.W.3d 246 (Mo. App. E.D., 2003).

Finally, Defendant points to *Aderhold v. Car2go N.A., LLC*, 2014 WL 794802, in support of its proposition that, despite the fact that the subject messages were part of the Defendant's overall marketing program which is intended to encourage the purchase of goods and services offered at the IP Casino Resort and Spa, the subject messages should not be considered "telemarketing" because Plaintiff could have simply ignored the promotional nature of the call. In the *Aderhold* case, the District Court found that a text massage sent to confirm the plaintiff's membership in a program offered by the defendant (which ultimately redirected to the

defendant's website) did not constitute telemarketing.  Defendant's reliance on the *Aderhold* case is misplaced.

In the instant case, Defendant's message encouraged Plaintiff to "visit BConnected online" specifically for the purpose of viewing "all of [his] offers."  Further, unlike the confirmation text message sent in the *Aderhold* case, Defendant's messages were delivered to Plaintiff because, through tracking his play through the BConnected program, he was deemed a valuable enough customer to receive free promotional offers intended to encourage him to visit Defendant's casino; where Defendant anticipated Plaintiff would purchase the goods and services it offered.

Stated plainly, the intent of the text message sent in the *Aderhold* case was nothing more than to confirm the plaintiff's membership in the defendant's program.  Conversely, the intent of the messages delivered by Defendant to Plaintiff was to present promotional offers intended to encourage him to visit Defendant's casino; where Defendant anticipated Plaintiff would purchase the goods and services it offered.  The fact that Defendant's marketing effort could be thwarted by Plaintiff's own discipline (his predetermination to simply attend a concert – which is likely intentionally brief in order to encourage concert goers to spend more time in the casino - and ignore the hotel room offers, multiple restaurants, and the excitement of the casino floor offered by Defendant in the same location) does not change the fact that Defendant's intent in sending the subject messages was to market its services.

**(2) The Messages Delivered by Defendant Constituted Telemarketing and Plaintiff's Prior Express Written Consent Was Required.**

Defendant argues that it was only required to obtain Plaintiff's prior express consent to initiate the subject calls.  Defendant correctly states the applicable regulation, but assumes that its calls do not constitute telemarketing.  However, because, as outlined above, the subject

messages did constitute telemarketing, Defendant was required to obtain Plaintiff's prior express written consent to receive such calls; which it failed to do.  47 C.F.R. §64.1200.

### B.  PLAINTIFF HAS STANDING TO BRING THIS ACTION, AND THE RULE 23 REQUIREMENTS CAN BE MET.

**(1) Plaintiff has Standing under the Proposed Class Definition.**

Attacks on class allegations prior to discovery and outside the Rule 23 certification mechanism circumvents the rigorous analysis required in ruling on certification and are disfavored.  *Gill-Samuel v. Nova Biomedical Corp.*, 298 F.R.D. 693, 700 (S.D. Fla. 2014); *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 621 (N.D. Cal. 2007); *Baas v. Dollar Tree Stores, Inc.*, 2007 WL 2462150, at *3 (N.D. Cal. 2007).  The court in *Gill* explained why resolving a Rule 23 issue pre-discovery via Rule 12 is not appropriate.

> Moreover, striking Plaintiff's class-action allegations from her Complaint would prevent the Court from reconsidering the certification issue at a later date absent amendment of the Complaint. This differs from an order on a motion for class certification, in which the class-action allegations remain intact, if dormant, in the complaint for the court to reconsider at a later date. Thus, an order on a motion to strike class-action allegations would, by its very nature, carry more finality and less prospective flexibility than the typical order on a motion for class certification. This lack of flexibility weighs against the general directive for expeditious consideration of certification and supports the notion that motions to strike should be viewed under a stricter standard than the typical Rule 23 motion.

*Gill v. Samuel*, 298 F.R.D. at 700.

Even if the Court were to entertain this premature attack on a class certification issue, it should reject Defendant's arguments regarding standing and superiority.  The Second Amended Complaint sufficiently establishes that Plaintiff's claims are typical of the claims of the putative class and that there are common issues of fact and law.

Defendant argues that Plaintiff does not have standing to represent the class described in the Second Amended Complaint because he received calls to his cell phone, and the class

extends to those who received calls on both cell phones and residential lines. This argument is an attack on Plaintiff's ability to establish commonality and typicality under Rule 23.

Plaintiff has properly pled the requirements of Rule 23, including that common questions of law and fact exist and that his claim is typical of the claims held by the putative class. (*see* Second Amended Complaint, ¶¶37-39). As stated above, an attack on the elements of certification at this stage, and without an opportunity to conduct class discovery, would result in the Court's rigorous analysis being premature.

But even based solely on the allegations stated in the Complaint, it is clear that these two requirements are met.  Commonality and typicality do not require that the representative's claims be factually and legally *identical* to those of the class.  The Eleventh Circuit has made clear that these requirements "may be satisfied even if some factual differences exist between the claims of the named representatives and the claims of the class at large."  *Kornberg v. Carnival Cruise Lines, Inc*., 741 F.2d 1332, 1337 (11th Cir. 1984); *see also Piazza v. Ebsco Indus., Inc*., 273 F.3d 1341, 1351 (11th Cir. 2001); *Prado-Steiman*, 221 F.3d at 1279, n. 14; *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985); *accord Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996)("Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory").

All that is required is a "nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class."  *Kornberg*, 741 F.2d at 1337; *see also Piazza*, 273 F.3d at 1351.  That nexus is established if "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory."  *Kornberg*, 741 F.2d at 1337; *see also Murray v. Auslander*, 244 F.3d 807,

811 (11th Cir. 2001)("The typicality requirement may be satisfied despite substantial differences ... when there is a 'strong similarity of legal theories.'"); *In re Scientific Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1326 (N.D. Ga. 2007).  Moreover, even where the representative plaintiff does not have standing to pursue all of the claims encompassed within the class, certification is still appropriate if the representative's "claim has the same essential characteristics as the claims of the class at large." *Piazza*, 273 F.3d 1341, 1351 (11th Cir. 2001).

There is a strong factual and legal nexus between Plaintiff's individual claim and the claims of the putative class.  As alleged, each class member received prerecorded voice messages that related to or promoted activities, events, goods or services offered by Defendant. That exactly describes the messages delivered to Plaintiff. The legal nexus arises from the fact that, for the purposes of Bennett's claims, calls to cell and residential lines are subject to the same legal requirements.  Under the TCPA, telemarketing calls using "an artificial and/or prerecorded voice message" to either a cell phone or a residential line are prohibited, unless the called party has given his prior express written consent. 47 C.F.R. 64.1200(a)(2)&(3).[3]  Thus the fact that the class includes recipients of telemarketing calls to residential lines makes no practical or legal difference.  Whether those calls constitute "telemarketing," whether the calls were made using a pre-recorded message or artificial voice and whether there was prior express written consent are all issues common to Bennett and the class, regardless to the type of line called.  There is no merit for Defendant's argument that Plaintiff cannot represent the class claims and a dismissal of those claims would be improper.

### (2) The Proposed Class Action Is The Superior Method Of Resolution.

---

[3]To be sure, within the entire regulatory scheme of the TCPA there are differences in the way calls to cell lines and residential lines are treated.  But those differences have no relevance here.  In terms of telemarketing calls made with an artificial voice or pre-recorded message, prior express written consent is required, regardless of the type of line called.

The superiority element is met when there is legal and factual nexus between the individual representative's claims and those of the class. "The more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir.2004), abrogated in part on other grounds by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008); see also, *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1184 (11th Cir. 2010).   As stated, there is a strong legal and factual connection between Bennett's claims and those of the putative class members. They all received the same prerecorded telemarketing, and each call required prior express written consent.   Therefore, resolution of all claims in this one action through the class action mechanism is superior. *See Motel 6,* 130 F.3d at 1006 n. 12 ("The predominance and efficiency criteria are of course intertwined. When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class."); *Shelley v. AmSouth Bank*, 2000 WL 1121778, at *8, (S.D.Ala. July 24, 2000) ("[S]uperiority analysis is intertwined with predominance analysis; when there are no predominant common issues of law or fact, class treatment would be either singularly inefficient ... or unjust.") (quotation marks omitted) (second alteration in original). Rule 23(b)(3) contains a "non-exhaustive" list of four factors courts should take into account in making this determination, *Miles v. Am. Online, Inc.,* 202 F.R.D. 297 (M.D.Fla.2001)**.**

The Court it should reject Defendant's argument individual TCPA actions are superior to class actions. In part, this is because the TCPA does not provide for recovery of attorney's fees or costs making the viability of individual claims unlikely. Recognizing this fact, the court in *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, 2014 WL 7366255, at *10 (S.D.

Fla. Dec. 24, 2014), stated, "the TCPA includes no provision for attorneys' fees, which makes it more difficult to file individual actions and thus undermines the relative superiority of individual actions under the TCPA."

The argument that individual actions are superior was also addressed and rejected squarely in *CMart, Inc. v. Metro. Life Ins. Co.,* 299 F.R.D. 679, 691 (S.D. Fla. 2014). *CMart* involved a class claim under the TCPA for unsolicited fax advertisements. The court rejected the defendant's argument that the availability of individual actions negated superiority of the class claim.

> While TCPA allows individual plaintiffs to sue a sender of unsolicited faxes, there appears to be no indication that Congress sought to eliminate class actions under the TCPA. See *Landsman & Funk PC v. Skinder–Strauss Associates,* 640 F.3d 72, 94–95 (3d Cir.2011). Further, the Court finds that the "large number of claims, along with the relatively small statutory damages, the desirability of adjudicating these claims consistently, and the probability that individual members would not have a great interest in controlling the prosecution of these claims, all indicate that [a] class action would be the superior method of adjudicating" the plaintiffs' claims under TCPA.

*CMart, Inc.,* 299 F.R.D. at 691. Several other courts have also rejected this argument. *See, Ott v. Mortgage Investors Corp. of Ohio,* 2014 WL 6851964, at *18 (D. Or. Dec. 3, 2014) ("there is no basis to strike the class allegations on the basis of superiority"); *Taylor v. Universal Auto Grp. I, Inc.,* 2014 WL 6654270, at *19 (W.D. Wash. Nov. 24, 2014)( "the Court finds that requirement is met, as "[i]t is evident that there are potentially thousands of class members with small claims,"'); *Savanna Grp., Inc. v. Trynex, Inc.,* No. 10-CV-7995, 2013 WL 66181, at *16 (N.D. Ill. Jan. 4, 2013)("Given the large number of plaintiffs in this suit and the similarity of their claims, disposition by class action is an efficient use of judicial resources.); *Reliable Money Order, Inc. v. McKnight Sales Co.,* 281 F.R.D. 327, 339 (E.D. Wis. 2012) aff'd, 704 F.3d 489 (7th Cir. 2013)(rejecting argument that individual TCPA claims are superior to class claim*);*

*Green v. Serv. Master On Location Servs. Corp.,,* 2009 WL 1810769, at *3 (N.D.Ill. June 22, 2009)(same); and *Hinman v. M and M Rental Center, Inc.,* 545 F.Sup.2d 802, 807 (N.D.Ill.2008)(same).

Defendant's annihilation argument against superiority has also been rejected. *See, e.g., Bateman v. Am. Multi–Cinema, Inc.,* 623 F.3d 708, 723 (9th Cir.2010) ("[T]he district court abused its discretion in considering the proportionality of the potential liability to the actual harm alleged in its Rule 23(b)(3) superiority analysis."); *Murray v. GMAC Mortg. Corp.,* 434 F.3d 948, 953–54 (7th Cir.2006) ("The district judge sought to curtail the aggregate damages for violations he deemed trivial. Yet it is not appropriate to use procedural devices to undermine laws of which a judge disapproves.").

Recently, the court in *Jay Clogg Realty Grp., Inc. v. Burger King Corp.*, 298 F.R.D. 304 (D. Md. 2014), a purported class action under the TCPA, denied a motion to dismiss or strike class allegations, wherein the defendant argued that a class action was not "superior to other available methods for fairly and efficiently adjudicating the controversy" because of the possibility of a large statutory damage award, saying:

> [T]he statutory damages that may be assessed in a class action are no different from those that may result in an enforcement action by a state attorney general. *See* 47 U.S.C. § 227(g)(1) (allowing a state to "bring a civil action on behalf of its residents ... to recover for actual monetary loss or receive $500 in damages for each violation"); *Md. v. Universal Elections, Inc.,* 862 F.Supp.2d 457, 464 (D.Md.2012) (calculating statutory damages at $500 per TCPA violation, based on 69,497 telephone calls, to be over $34 million before a determination as to willfulness). This may seem like harsh medicine, but it arguably is more likely to accomplish the TCPA's purpose of eliminating a "scourge on our society" than would restricting TCPA enforcement to individual actions, in the face of which junk faxers might consider a few thousand dollars' worth of enforcement actions to be a fair cost for intrusive and unwanted advertising directly into people's homes or offices.

*Jay Clogg Realty Grp., Inc. v. Burger King Corp.*, 298 F.R.D. 304, 310 (D. Md. 2014). See also,

*Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162, 1166 (S.D. Ind. 1997)("in mathematical terms, a $500 penalty for violation of the TCPA is not so high in relation to actual damages as to violate the Due Process clause.); *Am. Copper & Brass, Inc. v. Lake City Indus. Products, Inc.*, 2012 WL 3027953, at *5 (W.D. Mich. July 24, 2012) *aff'd,* 757 F.3d 540 (6th Cir. 2014)("At least two circuits have expressly said that a district court cannot consider the economic impact of potential damages for purposes of certification."); *Accounting Outsourcing, LLC. v. Verizon Wireless Pers. Commc'ns, L.P.*, 329 F. Supp. 2d 789, 818 (M.D. La. 2004) ("the civil damages provisions of the TCPA and the UTMA do not violate due process.").

Finally, issues regarding superiority, including the viability of individual claims, will depend on the particular facts surrounding Defendant's operation; facts yet to be explored through discovery.

## C. DEFENDANT'S ASSERTION THAT PLAINTIFF'S SECOND AMENDED COMPLAINT SHOULD BE STRICKEN IS WITHOUT MERIT AS LEAVE TO AMEND IS TO BE FREELY GRANTED, AND DEFENDANT CANNOT SHOW THAT IT IS HARMED BY THE AMENDMENT.

It is difficult to understand IP's dissatisfaction with the alterations made to the draft amendment filed with the Motion for Leave. It is well settled that leave to file amendment shall be freely given absent some "substantial reason" for denying the amendment such as undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, the amendment would cause undue prejudice to the opposing party or amendment would be futile. *Alhallaq v. Radha Soami Trading, LLC*, 484 F. App'x 293, 298 (11th Cir. 2012); *Burger King Corp. v. Weaver,* 169 F.3d 1310, 1319 (11th Cir.1999). This is particularly appropriate at this early stage in the litigation where IP has every opportunity to challenge the Second Amended Complaint under Rule 12 and, after discovery, under Rule 56.

Plaintiff did nothing improper here. The Motion for Leave candidly described the request to file an amended complaint "substantially similar" to the attached draft. Plaintiff did not represent the Court that it was seeking leave to file the attached amendment. Moreover, the Second Amended Complaint fully complied with the Court's Order granting leave, which did not restrict the leave to filing exactly what was attached to the motion. More importantly, many of the changes were made in response IP's 11-page opposition, which was filed after the Motion for Leave was filed. That opposition cataloged alleged the deficiencies in the Plaintiff's allegations. Where appropriate, changes were made to draft that addressed those alleged deficiencies. Other changes were made which simply "cleaned up" the allegations. The changes included elimination of some superfluous allegations regarding vicarious liability, further simplified the class definition to address what IP claimed was an unfair "failsafe" component and changes which further clarified Plaintiff=s legal and factual allegations. No new claims were filed, no parties were added, and no substantial changes were made to the factual allegations or legal theories. None of the changes render the filing of the Second Amended Complaint improper in any way. If anything, the changes provided IP a more concise and specific notice of what the Plaintiff claims IP did wrong and why a class action is appropriate. IP now cries "foul" because the amendment was altered to eliminate part of what IP claimed was unfair about the previous version. This is a head scratcher.

IP fails to explain how the changes made to the draft attached to the motion for leave calls it any prejudice whatsoever. If anything, the changes saved IP the time and expense of addressing those allege deficiencies which were corrected in the final Second Amended Complaint. It makes no sense to punish the Plaintiff for making additional changes in response to the criticisms laid out in IP's opposition. As a responsible litigant, it was prudent to make

changes, where appropriate, which would address the claimed deficiencies and head off another attack by IP, or at least narrow the issues in the inevitable motion to dismiss. The changes which eliminated IPs "fail-safe" argument did exactly that. IP clearly stated in its opposition that the draft amendment did not correct the claimed "fail safe" aspects of the definition. In response, Plaintiff further altered the class definition to address that concern. Taking a "damned if you do and damned if you don't" approach, IP now asks the Court to strike the amendment precisely for this reason. How could addressing the concerns expressed in the opposition cause prejudice to IP? That it is apparently upset that the improvements made to the amendment rob it of an opportunity to include more arguments on its motion to dismiss is hardly a valid basis for striking the Second Amended Complaint.

<u>**CONCLUSION**</u>

For the reasons stated above, the Court should enter an Order denying the said Motion in its entirety, and order that the causes of action proceed to discovery, and a full and complete trial on the merits.

/s/ *Kenneth J. Riemer*
KENNETH J. RIEMER (RIEMK8712)
One of the Attorneys for Plaintiff
Underwood & Riemer, P.C.
P. O. Box 1206
Mobile, AL 36633
Telephone: 251-432-9212
Fax: 251-990-0626
E-mail: kjr@alaconsumerlaw.com

**CERTIFICATE OF SERVI CE**

I hereby certify that on February 3, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will send an electronic notification of such filing to counsel of record.

/s/ *Kenneth J. Riemer*
KENNETH J. RIEMER